IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 18, 2000 Session

# IN THE MATTER OF JO'NISE YO'VEE PERRY, DOB: 12/19/1987, CHILD UNDER 18 YEARS OF AGE

**An Appeal from the Juvenile Court for Shelby County**
**No. B8915     George E. Blancett, Special Judge**

---

**No. W2000-00209-COA-R3-CV - Filed March 12, 2001**

---

This is an appeal from an order terminating parental rights. The father was imprisoned during the hearing of this case. The father argues on appeal that the juvenile court should have allowed him to be physically present at the hearing and should have granted him discovery he requested, and also contends that terminating his parental rights was not in his daughter's best interest. We find that the trial court did not abuse its discretion in deciding not to transport the father to the hearing, and in limiting the father's discovery. We also find that the trial court did not err in finding that termination of the father's parental rights was in the child's best interest. On this basis, we affirm the order terminating the father's parental rights.

**Tenn.R.App.P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed.**

HOLLY KIRBY LILLARD, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

Andrew Bernstein, Memphis, Tennessee, for the appellant, Johnny Perry, a.k.a. Is'mail Muhammad.

John S. "Tripp" Wilson, Memphis, Tennessee, for the appellee, Court Appointed Special Advocate.

## OPINION

This is an appeal from an order terminating parental rights. In this case, the Juvenile Court for Shelby County terminated the parental rights of Johnny Perry, a.k.a. Is'mail Muhammad ("Father") and Joyce Marie Brown ("Mother") in their twelve-year-old daughter, Jo'Nise Yo'Vee Perry ("Jo'Nise"). Father appeals the termination of his parental rights. The termination of Mother's parental rights are not at issue in this appeal.

Mother and Father lived together when Jo'Nise was born on December 29, 1987. Sometime in late summer 1988, Mother left and took Jo'Nise with her. After that, when Father was not incarcerated, he saw Jo'Nise about once a month. From 1989 to 1991, Father was in and out of jail.

In late 1991, Father lost contact with Mother and Jo'Nise. In September 1991, Jo'Nise was taken into protective custody by the Tennessee Department of Children's Services ("DCS")[1] because of Mother's drug abuse, her failure to provide Jo'Nise with food and clothing, and Mother's incarceration. Father claims that he did not learn that Jo'Nise had been taken into protective custody until October 1992. However, a court report by a DCS worker in October 1991 states:

> Johnny Perry, the father of said child, Jo'Nise Perry, has made frequent contacts with the Department. He has expressed great concern for his daughter and wants to work with DCS toward the child being reunited with her mother. Mr. Perry states that he would gladly be guardian over the family's income to make sure that the children are fed and clothed.

In October 1992, Father was sentenced to fifteen years incarceration for second degree murder. At the time Father was sentenced, Jo'Nise was four years old. Due to his good behavior in prison, Father was set for early release on February 28, 2000, and was in fact released on parole that day.

The record documents Jo'Nise's history in DCS custody. In September 1991, Mother and Jo'Nise and Jo'Nise's three half-siblings were living in the home of Mother's sister, Gloria Brown. Jo'Nise and her siblings were removed from Mother's custody on September 13, 1991, after Mother physically threatened Brown and damaged her home. On October 18, 1991, the Shelby County Juvenile Court found that the children were dependent and neglected and that foster care placement was in their best interest. Under the DCS plan of care signed by Mother on that day, the goal was to return Jo'Nise to Mother's care. However, on May 3, 1993, after Mother consistently failed to satisfy the conditions in the plan of care, the Foster Care Advisory Review Board recommended that the goal be changed to adoption.

On September 6, 1994, the Juvenile Court ordered that the children remain in foster care and that a Court Appointed Special Advocate (CASA)[2] be appointed to expedite the adoption process. However, nearly a year later, on August 22, 1995, the Juvenile Court ordered that Jo'Nise remain in foster care, but changed the goal from adoption to relative placement. The record does not reflect the reason for this change, but DCS progress reports dated July 3 and August 22, 1995, note that Mother was cooperating with DCS's requirements. These reports also state that Mother suffered

---

[1] The Tennessee Department of Children's Services or DCS, was established in 1996 in an effort to consolidate services provided to children by multiple state departments, including those provided by the Department of Human Services (DHS). 1996 Tenn. Public Acts 1079, §3. For purposes of this opinion, the term DCS will be used, though Jo'Nise's case was handled by DHS prior to 1996.

[2] The appellee in this case is CASA of Memphis and Shelby County, Inc., a Tennessee not-for-profit corporation authorized and appointed by the Shelby County Juvenile Court pursuant to Tenn. Code. Ann. § 37-1-149(b)(1) to serve as advocate for children who are alleged to be dependent and neglected within the meaning of Tenn. Code Ann. § 37-1-102(b)(12).

periodic relapses of drug use. The reports observe that the strong bond between Mother and her children could make adoption infeasible.

Almost two years later, on April 22, 1997, the Juvenile Court changed the goal in Jo'Nise's plan of care to adoption. The reason for the change is not expressly stated; however, a DCS progress report of the same date states that Mother had made no attempts to visit or contact Jo'Nise and that Father was incarcerated. Consequently, CASA filed a petition in the Juvenile Court on July 14, 1999, to terminate the parental rights of Father and Mother. Father filed a notice of intent to appear and oppose the termination of his parental rights. Father also sought appointment of counsel. The record is devoid of any response by Mother to CASA's petition. On November 3, 1999, the juvenile court appointed counsel to represent Father and appointed a Guardian Ad Litem to represent Jo'Nise's interests.

The Guardian Ad Litem filed her report on December 2, 1999. The report stated that Jo'Nise had no recall of Father and that she wished to remain with her foster family. Under "Findings," the Guardian Ad Litem reported that Jo'Nise had no desire to develop a relationship with Father. The Guardian Ad Litem concluded with her opinion that it was in Jo'Nise's best interest to be adopted by her foster mother.

The hearing to terminate Mother's and Father's parental rights was scheduled for December 2,1999. Prior to the hearing, Father filed two motions, a motion for transportation, asking the trial court to permit him to physically attend the hearing, as well as a motion for discovery. In the motion for discovery, Father asked the trial court to order DCS and CASA to permit him to inspect and copy all the documents they had that were relevant to the termination of his parental rights. He also asked that the trial court allow his attorney to interview Jo'Nise, any foster parents of Jo'Nise, and anyone who had expressed an interest in adopting Jo'Nise. The trial court denied the motion for transportation, noting that Father could testify by means of a telephonic device, pursuant to Tennessee Code Annotated § 36-1-113(f)(3). The trial court also denied in part Father's motion for discovery, allowing instead limited discovery, ordering CASA to provide Father a list of the witnesses they intended to call and allowing Father to take depositions of those witnesses. The hearing was held on December 2, 3, and 9, 1999.

At the hearing, the DCS supervisor who handled Jo'Nise's case, Christine Johnson, testified that Father had suggested several relatives of his with whom Jo'Nise could live. These included Father's seventy year old great uncle, and another relative in Wisconsin. Johnson testified that Jo'Nise did not want to move to Wisconsin. She noted that Father wrote a letter to DCS acknowledging that it would probably be in Jo'Nise's best interest to be adopted by her foster family. Johnson testified that DCS had no definitive record of Father's address until January 1996, despite several attempts by Father to contact DCS in 1991. She said that DCS had notice of Father's incarceration in December 1993. She admitted that DCS did not send copies of Jo'Nise's plans of care to Father, nor did they inform him of his rights and obligations under the plans. She testified that DCS learned in June 1999 that Father was set for early release on February 28, 2000.

Jo'Nise's foster mother, Lucy Anderson, testified that Jo'Nise lives in her home with five other foster children that she has adopted. Anderson stated that Father calls Jo'Nise often and that she even offered to pay for his calls. She stated that Father and Jo'Nise talk for short periods of time, and that Jo'Nise typically answers Father's questions with a "yes" or "no" and does not volunteer much information. Anderson testified that Jo'Nise did not want to live with Father's sister in Minnesota. Anderson noted that her conversations with Father were pleasant. Anderson's granddaughter testified that Jo'Nise had told her that she wanted to stay with Anderson and her family because it was the only family that she had known since she was four years old.

Father testified by telephone at the hearing. He testified that, while in prison, he learned Jo'Nise's location and added her to his approved phone list. He made regular calls to her, sent her cards and letters, and sent her money and gifts when he was able to afford it. He testified that he sent Anderson a form to have Jo'Nise added to his approved visitation list, but that Anderson told him DCS said that she could not submit the form. Father also testified about the letter to DCS in which he said it would be in Jo'Nise's best interest to be adopted by Anderson. Father explained that he did not understand the legal implications of such a statement and asserted that he did not concede that it was in Jo'Nise's best interest to have his parental rights terminated. He testified that he was not seeking custody of Jo'Nise, but that he wanted to be able to develop a relationship with her. Father stated that he did not use drugs or alcohol, and that he would obtain employment once he was released from prison. He acknowledged that he understood he would have to pay child support if his parental rights were not terminated.

After hearing the evidence, on January 6, 2000, the juvenile court issued an order terminating the parental rights of both Mother and Father. From this order, Father now appeals.

Father raises four issues in this appeal. He argues first that the juvenile court violated his due process rights under the United States Constitution and the Tennessee Constitution by denying his motion for transportation and by limiting the scope of his discovery. Second, he maintains that DCS had a statutory obligation to provide him with copies of Jo'Nise's plans of care and progress reports, and to use reasonable efforts to provide him with the services necessary to reunite him with Jo'Nise. He contends that DCS' failure to fulfill this statutory obligation precludes DCS from now seeking termination of his parental rights. Third, Father argues that the juvenile court erred in finding that he failed to visit with Jo'Nise in the four months preceding his incarceration. Finally, Father argues that it is not in Jo'Nise's best interest to terminate his parental rights.

Parents have a fundamental right in the care, custody, and control of their children. *See Stanley v. Illinois*, 405 U.S. 645, 651-52 (1972); *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994). This right is not absolute, however, and may be terminated in certain limited circumstances. *See In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999). The termination of parental rights must be based on (1) a finding by the court based on clear and convincing evidence that one or more statutory grounds exists justifying the termination of parental rights, and (2) a finding that termination of parental rights would be in the child's best interests. *See* Tenn. Code Ann. § 36-1-113(c); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Father concedes that, under Tennessee

Code Annotated § 36-1-113(g)(6), statutory grounds exist to support the termination of his parental rights, namely, Father's incarceration under a sentence of ten years or more, at a time when Jo'Nise was under 8 years old.[3]

Previous decisions have examined whether a juvenile court's denial of an imprisoned parent's motion for transportation violates due process. *See In re Rice*, No. 02A01-9809-CH-00239, 1999 WL 86980 (Tenn. Ct. App. Feb. 23, 1999); *State v. Moss*, No. 01A01-9708-JV-00424, 1998 WL 122716 (Tenn. Ct. App. March 20, 1998). The right of a prisoner to be physically present for the hearing of a civil matter in which he is a party depends in part on whether he is a plaintiff or a defendant. *Moss*, 1998 WL 122716, at *3. In *Whisnant v. Byrd*, 525 S.W.2d 152 (Tenn. 1975), the Tennessee Supreme Court held that the prisoner *plaintiff* did not have the right to physically appear at the courthouse to prosecute his suit, but he had the right to have the trial of the action held in abeyance until his release. *Whisnant*, 525 S.W.2d at 154, *holding clarified, Sanjines v. Ortwein and Assocs. P.C.*, 984 S.W.2d 907, 910 (Tenn. 1998) ("the Court did not hold that a stay is necessary in all civil actions filed by incarcerated persons . . . [t]he Court was concerned only with the rights and qualifications of an inmate to appear in court *for trial*.")(emphasis added). As to prisoner defendants, previous panels of this Court have referred to *Strube v. Strube*, 764 P.2d 731, 735 (Ariz. 1998), which stated:

> Prisoners have a right of access to the courts for legitimate purposes. At least with respect to a significant civil proceeding initiated against a prisoner by others, we hold that there is a presumption that the prisoner is entitled to be personally present at critical proceedings, such as the trial itself, when he has made a timely request to be present. Of course, this is a rebuttable presumption and the ultimate decision is within the sound discretion of the trial court.

*See Moss*, 1998 WL 122716, at *4; *Tolbert v. Tolbert*, No. 03A01-9406-CV-00230, 1994 WL 705230, at **2-**3 (Tenn. Ct. App. Dec. 15, 1994). In *Moss*, this Court remarked that Tennessee has not adopted the rebuttable presumption advocated by *Strube*, but has held that the decision to permit a prisoner to physically appear in court to defend a civil proceeding is within the sound discretion of the trial court. *Moss*, 1998 WL 122716, at *4.

Father contends that, since this case involves his fundamental rights as a parent, due process requires that he have the right to physically attend and give testimony, and to confront the witnesses

---

[3]Tennessee Code Annotated § 36-1-113(g) reads:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the following grounds:
> . . . (6) The parent has been confined in a correctional or detention facility of any type, by order of the court as a result of a criminal act, under a sentence of ten (10) or more years, and the child is under eight (8) years of age at the time the sentence is entered by the court.

who testify against him. In *Knight v. Knight*, 11 S.W.3d 898, 903 (Tenn. Ct. App. 1999), involving a prisoner defendant who was sued for divorce, *Strube* was again quoted, noting that the prisoner's right is to be afforded meaningful access to the courts:

> The United States Supreme Court has established that a prisoner has a constitutional right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72, 78 (1977). This right is founded in the due process clause of the fourteenth amendment. *Wolff v. McDonnell*, 418 U.S. 539, 579, 94 S.Ct. 2963, 2986, 41 L.Ed.2d 935, 964 (1974). Of course, a prisoner's right of access is not absolute. *Whitney v. Buckner*, 107 Wash.2d 861, 866, 734 P.2d 485, 488 (1987). However, at a minimum, due process requires that absent a countervailing state interest of overriding significance, prisoners must be afforded meaningful access to the courts and an opportunity to be heard. *See Bounds*, 430 U.S. at 822, 97 S.Ct. at 1495, 52 L.Ed.2d at 79; *Boddie v. Connecticut*, 401 U.S. 371, 377, 91 S.Ct. 780, 785, 28 L.Ed.2d 113, 118 (1971).

*Knight*, 11 S.W.3d at 903 (quoting *Strube*, 764 P.2d at 733). Therefore, where a fundamental right such as marriage or parental rights is at stake, due process requires the trial court to provide the prisoner defendant with *meaningful* access to the court and an opportunity to be heard. As noted in *Moss*, "there appears to be no basis, constitutional or otherwise, to extend this right [to personally appear in a civil proceeding] to party defendants. Accordingly, we opine that the current status of the law is that party defendants have no absolute right to be in attendance at the hearing of a civil matter." *Moss*, 1998 WL 122716, at *5.

Tennessee Code Annotated § 36-1-113(f)(3), provides for alternative means of affording a prisoner such meaningful access:

> That the incarcerated parent or guardian has the right to participate in the hearing and contest the allegation that the rights of the incarcerated parent or guardian should be terminated, and, at the discretion of the court, such participation may be achieved through personal appearance, teleconference, telecommunication or other means deemed by the court to be appropriate under the circumstances.

Father argues that the means provided for in this statute denied him fundamental due process in this case.

Both *Moss* and *Tolbert* discussed the factors that should be considered in the trial court's exercise of this discretion to provide the prisoner defendant with meaningful access to the courts and an opportunity to be heard. *See Moss*, 1998 WL 122716, at *5; *Tolbert*, 1994 WL 705230, at **3. Both cases quote extensively from *Stone v. Morris*, 546 F.2d 730, 735-36 (7th Cir. 1976):

> In making his determination the [trial] judge should take into account the costs and inconvenience of transporting a prisoner from his place of incarceration to the

courtroom, any potential danger or security risk which the presence of a particular inmate would pose to the court, the substantiality of the matter at issue, the need for an early determination of the matter, the possibility of delaying trial until the prisoner is released, the probability of success on the merits, the integrity of the correctional system, and the interests of the inmate in presenting his testimony in person rather than by deposition.

In this case, the record indicates that reasonable efforts were made to insure that Father's participation was meaningful and that he had a fair opportunity to be heard. The order terminating parental rights notes that Father testified via telephone, that he conferred privately with his attorney, and that he "testified articulately in his own behalf." The transcript of the proceedings also indicates that in several instances, exhibits were sent to him via facsimile during his testimony, and that the trial judge relaxed the rules of evidence in order to let Father answer leading questions from his attorney and also allowed him to testify as to hearsay. Under these circumstances, we cannot find that the juvenile trial court abused its discretion in refusing to permit Father to attend the hearing. The juvenile court's decision is affirmed on this issue.

Father also contends that the juvenile court's order permitting only limited discovery violated due process. He argues that the juvenile court should have granted him access to DCS records and permitted him to interview Jo'Nise. Father cites *Goldberg v. Kelley*, 397 U.S. 254, 266 (1970), for the proposition that due process requires more liberal discovery when a fundamental right is involved, and he states that the limited discovery prevented him from being "fully informed of the case against him so as to contest its basis and produce evidence in rebuttal." He also argues that the order limiting discovery violated three rules applicable to the Shelby County Juvenile Court. He first cites Rule 10 of the Rules of the Shelby County Juvenile Court, which states: "Court Appointed Special Advocate (CASA) and child welfare agency reports shall be confidential and, unless the Court directs otherwise, shall be submitted to the Court in original form only, in camera, and may be reviewed exclusively by counsel for the parties." Second, he cites Rule 33 of the Tennessee Rules of Juvenile Procedure, regarding the confidential nature of juvenile records:

**RULE 33.     PREDISPOSITION REPORT/SOCIAL HISTORY**

 . . . **(e) Inspection of Reports; Confidentiality**.  Generally, the child, the child's attorney, and the child's parent, guardian or legal custodian shall be entitled to inspect the predisposition report and all medical, psychological and other reports on which it is based, except that information protected from disclosure by law. However, the court in its discretion may decline to permit inspection of sensitive reports, or portions thereof, to anyone other than an attorney if it determines that such inspection would be detrimental to the child . . . [I]n order to permit response pursuant to Rule 32(f), the court shall disclose, at least to attorneys for the parties, any confidential information relevant to disposition.

Lastly, Father contends that the order violated Rule 32(f) of the Tennessee Rules of Juvenile Procedure, which provides:

> . . . **(f) Evidence Admissible**. In arriving at its dispositional decision, the court shall consider only evidence which has been formally admitted, and the juvenile court record of the child. . . . The rules of evidence shall apply except that reliable hearsay including, but not limited to, certified copies of convictions or documents such as psychiatric and psychological evaluations of the child or the child's parents or custodian or reports prepared by the Department of Human Services, may be admitted provided that the opposing party is accorded a fair opportunity to rebut any hearsay evidence so admitted. . . . The parties shall have the right to examine any person who has prepared any report admitted into evidence.

Father argues that all of these rules were violated by the order limiting his discovery to the names of CASA's intended witnesses and to oral depositions of those witnesses. He maintains that he was not able to mount a meaningful defense because he could not obtain information about DCS's failure to fulfill its obligations. Father also argues that, since he could not interview Jo'Nise, he could not rebut the "unchallenged assertions" that Jo'Nise wished to be adopted by her foster mother.

Generally, the scope of discovery in a civil suit filed by a prisoner is within the sound discretion of the trial court. *See Sweatt v. Compton*, No. 02A01-9710-CV-00252, 1999 WL 43290, at *8 (Tenn. Ct. App. Feb. 2, 1999); *Bradfield v. Dotson*, No. 02A01-9707-CV-00152, 1998 WL 63521, at *3 (Tenn. Ct. App. Feb. 17, 1998). Indeed, the rules cited by Father implicitly recognize that the juvenile judge has discretion in permitting discovery. Rule 10 of the Rules of the Shelby County Juvenile Court states that CASA and child welfare agency reports "*may* be reviewed exclusively by counsel for the parties," and that "[d]iscovery may then be allowed under such terms and conditions as the Court may prescribe." The other rules cited by Father pertain to the confidentiality of reports filed with the juvenile court, and do not govern limits that a trial court may impose on a prisoner's discovery.

In this case, the juvenile court allowed Father to have the names of CASA's intended witnesses and allowed him the opportunity to depose those witnesses orally. Through the deposition of DCS's witnesses, Father's attorney could elicit information regarding Jo'Nise's history in DCS custody. Father argues that he should have been permitted to interview Jo'Nise, but the evidence is undisputed that Father regularly spoke to Jo'Nise by telephone. Under these circumstances, we cannot find that the trial court abused its discretion in limiting Father's discovery.

Next, Father contends that DCS did not fulfill its statutory obligation to provide him with notice of Jo'Nise's plans of care and did not use reasonable efforts to reunite him with Jo'Nise. He argues that this should preclude DCS from seeking a termination of his parental rights. Father cites Tennessee Code Annotated §§ 37-2-403(a)(2)(B)(i) and 37-2-403(a)(2)(B)(ii)(c), which address the parents' notice regarding the plan of care. Father also cites various portions of Tennessee Code

Annotated § 37-1-166 for the general proposition that DCS must use all reasonable efforts to reunite a child with his or her natural parents.

These factors, however, are "entirely separate from the reasons for terminating [Father's] parental rights." *See State v. Wilkerson*, No. 03A01-9810-JV-00341, 1999 WL 775759, at **3 (Tenn. Ct. App. Sept. 15, 1999). In this case, it is undisputed that, under Tennessee Code Annotated § 36-1-113(g)(6), there are independent statutory grounds for the termination of Father's parental rights. Thus, "[w]hether or not [Father] was able to participate in any decisions regarding the child, an independent basis for terminating parental rights was established by clear and convincing evidence." *Wilkerson*, 1999 WL 775759 at *3. Therefore the decision of the juvenile court is affirmed on this issue.

Father next argues that the juvenile court erred in finding that he failed to visit Jo'Nise in the four months prior to his incarceration, citing *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999). We need not address this argument, however, since it is undisputed that separate grounds for termination of Father's rights existed under Tennessee Code Annotated § 36-1-113(g)(6), based on Father's incarceration.

Lastly, while Father concedes that statutory grounds for termination exist under Tennessee Code Annotated § 36-1-113(g)(6), he does not concede that termination of his parental rights was in Jo'Nise's best interest. Father argues that the trial court erred in finding that termination of Father's parental rights was in Jo'Nise's best interest.

Among the factors to be considered are whether the parent has maintained regular visitation with the child and whether a meaningful relationship has been established between the parent and the child. *See* Tenn. Code Ann. §§ 36-1-113(i)(3) and (4). The court may consider other factors in addition to the ones listed in Tennessee Code Annotated § 36-1-113(i) in deciding whether to terminate parental rights.

In this case, all of Jo'Nise's progress reports indicated that she adjusted well to her foster home, behaved well and was in good health, and that she succeeded academically in school while in foster care. There was also evidence that Jo'Nise wanted to be adopted by her foster family. The evidence indicated that Father's relationship with Jo'Nise was limited to a short phone call each month, and that Jo'Nise had expressed no desire to develop a more meaningful relationship with Father. Father testified that he did not seek custody of Jo'Nise, but wanted to retain his parental rights only in order to develop a relationship with her. Under these circumstances, we cannot conclude that the juvenile court erred in finding that termination of Father's parental rights was in Jo'Nise's best interest. Therefore, the decision of the juvenile court on this issue must be affirmed.

The decision of the juvenile court is affirmed. Costs of this appeal are taxed to the Appellant, Johnny Perry, a.k.a. Is'mail Muhammad, and his surety, for which execution may issue if necessary.

_____

HOLLY KIRBY LILLARD, JUDGE